**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| HENRY KLEYWEG,<br>CLAUDIA KLEYWEG,<br><br>          Plaintiffs,<br><br>   v.<br><br>BANK OF AMERICA, N.A., BAC HOME<br>LOANS SERVICING, LP,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 2:14-CV-00138-JD-PRC<br><br>Removed from the Porter Superior Court for<br>the State of Indiana<br>Case No. 64D01-1403-PL-2699 |

## DEFENDANT BANK OF AMERICA, N.A., BAC HOME LOANS SERVICING, LP'S ANSWER TO PLAINTIFFS' COMPLAINT

Defendant, Bank of America, National Association, BAC Home Loans Servicing, LP[1] ("BANA"), by counsel, for its Answer to Plaintiffs Henry Kleyweg and Claudia Kleyweg's ("Plaintiffs") Complaint states:

## I.  BACKGROUND INFORMATION PERTINENT TO THE ALLEGATIONS

### A.  *The Home Affordable Modification Program*

1.       On April 17th 2009 Bank of America, N.A., (*"Defendant"*) entered into a servicer participation agreement, incorporated by reference herein, with FANNIE MAE, as financial agent for the U.S. Treasury.  See Servicer Participation Agreement (*"SPA"*) for the Home Affordable Modification Program, attached hereto and marked as

**ANSWER:**

BANA states that any such agreement speaks for itself.

---

[1] BAC Home Loans Servicing, LP merged with and into Bank of America, N.A. on July1, 2011.  As such, Bank of America, N.A. responds on behalf of itself and BAC Home Loans Servicing, LP.

2.      The servicer agreement established Defendant as a participant in the U.S. Treasury's Home Affordable Modification Program ("HAMP"), hereby incorporated by reference, and bound Defendant to HAMP's obligations, regulations, and procedures.

**ANSWER:**

BANA states that the servicer agreement speaks for itself.  To the extent that the allegations of Paragraph 2 of Plaintiffs' Complaint constitute legal conclusions, no response is required.

3.      HAMP and its associated directives also set prohibitions against certain conduct including instituting or continuing foreclosure proceedings while a borrower is being evaluated for a loan modification, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

**ANSWER:**

The allegations of Paragraph 3 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

4.      Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

**ANSWER:**

BANA denies the allegations of Paragraph 4 of Plaintiffs' Complaint.

5.      Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification.  However, this incentive is

countered by a number of financial factors that make it more profitable for a mortgage servicer such as BOA to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure.  This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by BOA because BOA does not carry a significant risk of loss in the event of foreclosure.  On information and belief, BOA does not own a significant majority of the loans on which it functions as servicer.

**ANSWER:**

The allegations of Paragraph 5 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.  To the extent a response is required, BANA denies the allegations of Paragraph 5 of Plaintiffs' Complaint.

6.    Economic factors that discourage BOA from meeting its obligations under HAMP by facilitating loan modifications include the following:[2]

- BOA may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that BOA, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that BOA charges borrowers that are in default constitute a significant source of revenue to it. Aside from income BOA directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover

---

[2] See Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009)

expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front costs to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

**ANSWER:**

The allegations of Paragraph 6 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.  To the extent a response is required, BANA denies the allegations of Paragraph 6 of Plaintiffs' Complaint.

7.      Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, BOA has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States.  BOA's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by BOA, who are eligible for permanent loan modifications, and who have met the requirements for participation in HAMP, have not received permanent loan modifications to which they are entitled.

**ANSWER:**

BANA denies the allegations of Paragraph 7 of Plaintiffs' Complaint.

8.      HAMP's purpose was to provide a uniform framework for loan modifications and foreclosure prevention services for eligible borrowers under the Emergency Economic Stabilization Act of 2008 and the American Recovery and Reinvestment Act of 2009.

**ANSWER:**

The allegations of Paragraph 8 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

4

9.      Defendant's participation in HAMP obligated it to specific guidelines, terms and conditions set forth by the U.S. Treasury in its *"documentation, instructions, bulletins, letters, directives, or other communications that could change or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program"* (*"Program Documentation"*).   HAMP also requires servicers to comply with all state laws. HAMP HANDBOOK, Chapter I,§ 1.6.

**ANSWER:**

The allegations of Paragraph 9 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.  To the extent that a response is required, BANA denies the allegations in Paragraph 9 of the Complaint.

10.     The Making Home Affordable Program documentation includes a Handbook for Servicers (*"HAMP Handbook"*), incorporated by reference into the SPA and changes, describes or clarifies the scope, rights, and duties of servicers as a participant in HAMP, and may prospectively change the HAMP requirements.

**ANSWER:**

The allegations of Paragraph 10 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

11.     The Handbook requires servicers to retain all documentation of their analysis and to document all communications (verbal and written) with a borrower.  HAMP HANDBOOK, Chapter I, § 2.2.

**ANSWER:**

The allegations of Paragraph 11 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

5

12.     Servicers are required to "develop, enforce, and review" quarterly its effectiveness for an internal control program designed to:

a)      "Ensure effective delivery of Services in connection with HAMP; and
b)      * * *
c)      Monitor compliance with applicable consumer protection ... laws." Id.,§ 2.4.

**ANSWER:**

The allegations of Paragraph 12 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

13.     Servicers must "execute an effective quality assurance program that includes Independent reviews of each MHA program (*e.g.* HAMP … ).  Id. § 2.7.  A servicer's quality assurance program must be reviewed in order to assess risks and weaknesses that have adverse borrower impacts (*e.g.*, non-approvals, foreclosures, et. cet.). Id.§ 2.7.2.  Potential adverse borrower impacts include, *inter alia*, the availability and responsiveness of servicing personnel to borrower inquiries, questions, complaints, and tracking and retention of documentation submitted by borrowers, and "adherence to prohibitions on referral of loans to foreclosure and conducting of scheduled foreclosure sales .... " and "conduct of trial period plans, including documentation, application of payments, and use of suspense/unapplied funds accounts, credit reporting and conversion to permanent modification for mortgages as appropriate." Id. §2.7.2-3.

**ANSWER:**

The allegations of Paragraph 13 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

14.     Servicers must review their quality assurance programs at least quarterly.  Id.at §2.6.4.3.  Within forty-five (45) days of a quality assurance review, a report must be distributed to the appropriate executives or board-level committees, including senior management.  Id. at §

6

2.7.3.   The plan must include a rigorous follow up process to ensure that management is remediating any issues identified in the reports. Id.

**ANSWER:**

The allegations of Paragraph 14 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

15.     Servicers must file certifications stating that it was in compliance with, and the truth and accuracy of, the representations and warranties related to HAMP on a yearly basis.  Id. § 2.6.1.

**ANSWER:**

The allegations of Paragraph 15 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

16.     Servicers *"*must have adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents.*"*  HAMP HANDBOOK, Chapter II, § 2.1.

**ANSWER:**

The allegations of Paragraph 16 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

17.     A *"*Right Party Contact*"* occurs after successful efforts by a servicer to communicate with the borrower about resolving any mortgage delinquency.  *"*If *'*Right Party Contact*'* is established and the borrower expresses an interest in HAMP, the servicer must send a written communication describing the Initial Package, which the borrower is required to submit to request a HAMP modification. Id. § 2.2.2.   Servicers must provide borrowers with clear,

written information designed to help the borrower understand the modification process.  Id. §
2.1.

**ANSWER:**

The allegations of Paragraph 17 of Plaintiffs' Complaint constitute legal conclusions to
which no response is required.

18.     The borrower's Initial Package includes evidence of income and a Request for
Modification Form and Affidavit (Collectively *"RMA Form"*).  Id. § 4-4.1.1.  The RMA form
provides the servicer with borrower financial information and the cause of the borrower's
hardship. Id.  The hardship affidavit attests that the borrower is unable to continue making full
mortgage payments and describes several hardships, including: reduction/loss of income that was
supporting the mortgage; change in financial circumstances, and a lack of sufficient cash
reserves to maintain payment on the mortgage and cover basic living expenses at the same time.
Id.§ 4.1.1.[3]

**ANSWER:**

The allegations of Paragraph 18 of Plaintiffs' Complaint constitute legal conclusions to
which no response is required.

19.     Cash reserves include cash, savings, money market funds, marketable stocks or
bonds.  Cash reserves do not include retirement accounts and assets that serve as an emergency
fund.  Id.  A lack of sufficient cash reserves is found if the cash is insufficient to maintain
payment on the mortgage and cover basic living expenses at the same time.  Id.  HAMP does not
distinguish between short-term and long-term hardships. Id.

---

[3] The initial package also requires sending in IRS Form 4506-T or 4506 T-EX, and Dodd-Frank Certification.
HAMP HANDBOOK, Chapter II, § 4.

**ANSWER:**

The allegations of Paragraph 19 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

20.     The servicer must resend the Initial Package communication if Right Party Contact is established but the Initial Package has not yet been submitted by the borrower.  Id. Only if the borrower does not respond after the servicer's repeated request may the servicer determine the borrower to be ineligible for HAMP.  Id.  Servicers must retain all documentation they receive from borrowers and document all communications (verbal & written) with a borrower.  HAMP HANDBOOK, Chapter I, § 2.2.

**ANSWER:**

The allegations of Paragraph 20 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

21.     A borrower's loan cannot be referred to foreclosure unless, *inter alia*, the borrower is ineligible for HAMP or fails to make current trial period payments.   HAMP HANDBOOK, Chapter II, § 3.1.1.

**ANSWER:**

The allegations of Paragraph 21 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

*B.  The Trial Payment Period ("TPP")*

22.     Eligible borrowers under HAMP initially enter into temporary written loan modification contracts (called a trial period plan, *"TPP"* for short) having a three (3) month duration that becomes permanent once the HAMP requirements outlined above are fulfilled.  Id. § 8.  A TPP notice is sent out setting forth the terms and conditions for the trial period.  Id. §8.1.

The borrower is not required to sign or return the TPP notice. Id. The trial period starts on the TPP effective date as indicted by the TPP notice. Id.

**ANSWER:**

The allegations of Paragraph 22 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

23.     The HAMP Handbook does not require borrowers to actually sign a TPP contract. The loan servicer's receipt of the first TPP payment is evidence of the borrower's acceptance of the HAMP and its terms and conditions.  HAMP HANDBOOK, Chapter II,§ 8.3.

**ANSWER:**

The allegations of Paragraph 23 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

24.     The TPP requirements are that the borrower makes at least three (3) monthly loan payments in the modified payment amount as set forth in the TPP notice, and submits the required Initial Package documentation. As outlined above, if the borrower does not receive the Initial Package the servicer should resend it.

**ANSWER:**

The allegations of Paragraph 24 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

25.     TPP lowers the borrower's monthly payment to a level he or she can afford. During TPP, the modified payment is less than the borrower's original mortgage payment, comprised of the contractual principal, interest, tax and insurance payment (*"PITI"*).  Because the modified TPP is not yet a binding obligation before permanent modification occurs, the borrower is still legally obligated to pay the servicer his or her full PITI amount owed under the

original mortgage agreement before permanent modification is granted.  The difference between the borrower's TPP payments and the original PITI obligation are accrued as a capitalized cost to be applied after permanent modification.  Accordingly, servicers hold the lesser TPP payments received as *"unapplied funds."*  The servicer does not apply the funds to pay-down the mortgage when received because the payment does not constitute a full *"PITI"* payment.  HAMP HANDBOOK, Chapter II, § 8.4.  *"When the total of the [TPP] payments held as unapplied funds is equal to a full PITI payment,"* only then is the servicer *"required to apply all full payments to the mortgage loan."*  Id.  Because the unapplied funds are not applied to pay down the loan every month, a deficiency accrues and increases every month.  The servicer is permitted to capitalize the accrued arrearages upon permanent modification.

**ANSWER:**

The allegations of Paragraph 25 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

26.  During the TPP stage, the servicer is allowed to capitalize accrued interest, its escrow advances to third parties, and any principal forbearance.  HAMP HANDBOOK, Chapter II, § 6.3.  Thus, the servicer is allowed to accrue the monthly PITI deficiency that is created by the difference in the original mortgage payment and the modified TPP payment during the temporary period.  The PITI deficiency amounts that accrue during TPP period are added to the principal balance of the loan as a capitalized cost once permanent modification takes effect.  The borrower has to pay back the capitalized costs over the term of the loan.  The more quickly a servicer modifies a loan, the less money it will receive through accrued capital costs. *Vice versa, the longer it takes for a servicer to permanently modify a loan, the accrued capital costs it can*

11

*charge a borrower increases*; thus, incentivizing the lender to stretch out the period of time to process a loan modification for a borrower.

**ANSWER:**

The allegations of Paragraph 26 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

27.    *"Servicers are encouraged to require automated payment methods, such as automatic payment drafting under HAMP."* Id. at§ 8.4.  Additionally, *"if a borrower makes a payment that is greater than his or her TPP payment, the servicer must determine if the borrower remains eligible for HAMP and, if making the contractual payment could jeopardize eligibility, notify the borrower in writing that making payments in excess of the trial period payment may jeopardize the borrower's HAMP modification.  Id.*

**ANSWER:**

The allegations of Paragraph 27 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

28.    When determining a borrower's eligibility for HAMP based upon income, if a Servicer believes that additional information unique to a borrower's circumstance is necessary and should be considered under HAMP, the Servicer is to exercise business judgment in how the servicer calculates the borrower's income.  Id. § 5 .1.  Servicers should use good business judgment when verifying a borrower's income. Id.

**ANSWER:**

The allegations of Paragraph 27 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

29.     A servicer cannot refer a loan in the TPP stage to foreclosure unless, *inter alia*, the borrower fails to make the current trial period payments or fails to provide the required information to the servicer after the servicer requests the documentation on two separate occasions.  HAMP HANDBOOK, Chapter II, § 3. I. I.

**ANSWER:**

The allegations of Paragraph 28 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

30.     Under HAMP, servicers must report the borrower as current to the credit bureau reporting agencies if the borrowers are in fact current.  Additionally, servicers are required to report a *"full file"* status report to the credit reporting agencies for each loan under HAMP. Full-file reporting means that the servicer must describe the exact status of each mortgage it is servicing as of the last business day of each month.  Id., § I 2.2.

**ANSWER:**

The allegations of Paragraph 28 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

*C.  Permanent Modification*

31.     A borrower transitions from TPP to a permanent modification when a servicer has *"received all required trial period payments timely and all other required documentation from the borrower, including a fully executed Modification Agreement."*   HAMP HANDBOOK, Chapter II, § 9.  Servicers are to prepare the permanent HAMP modification agreement early enough to allow sufficient processing time for the modification to become effective on the first day of the month following the three month trial payment period.  Id.

**ANSWER:**

The allegations of Paragraph 31 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

32.     Once permanent modification occurs, all late charges, penalties, and other fees must be waived and no administrative costs may be charged to the borrower.  Id., § 9.3.2-9.3.3. After modification, servicers must report the modification and are to ensure that all borrowers who receive a permanent modification are reported to credit agencies using the 'CN' Special Comment Code and not the 'AC' Special Comment Code.

**ANSWER:**

The allegations of Paragraph 32 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

33.     Servicers are permitted to capitalize any deficiency in the PITT payments that accrued during the TPP stage once permanent loan modification occurs.  HAMP HANDBOOK, Chapter II, § 6.3.

**ANSWER:**

The allegations of Paragraph 33 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

34.     "If an eligible borrower successfully completes the trial period and should have been converted to a permanent modification, but for reasons beyond his or her control was not timely converted to a permanent modification, ... the servicer must offer the borrower a modification that puts the borrower in the same position as he or she would have been if the servicer converted the borrower to a permanent modification."  Id. § 9.5.  Payments made after the modification date but before conversion are to be applied retroactively."  Id.

14

**ANSWER:**

The allegations of Paragraph 34 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

35.    A servicer receives $1,000.00 from the government for each loan that is permanently modified under HAMP. Id.,§ 13.1.1.

**ANSWER:**

The allegations of Paragraph 35 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

36.    Defendant Bank of America, N.A. is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255.  Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302.

**ANSWER:**

BANA admits that its headquarters is located at 100 North Tryon Street, Charlotte, North Carolina 28202.  BANA admits that BAC Home Loans Servicing, LP merged with and into Bank of America, N.A. on July 1, 2011.  BANA denies the remaining allegations of Paragraph 36 of Plaintiffs' Complaint.

37.    At all times herein mentioned, Defendants, Bank of America, N.A. and BAC Home Loans Servicing, LP, both individually and collectively, are and were agents and/or joint venturers of each other, and in doing the acts alleged herein were acting within the course and scope of such agency.

**ANSWER:**

BANA admits that BAC Home Loans Servicing, LP merged with and into Bank of America, N.A. on July 1, 2011.  BANA denies the remaining allegations of Paragraph 37 of Plaintiffs' Complaint.

38.     Each Defendant had actual and/or constructive knowledge of the acts of the other Defendant as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

**ANSWER:**

BANA admits that BAC Home Loans Servicing, LP merged with and into Bank of America, N.A. on July 1, 2011.  BANA denies the remaining allegations of Paragraph 38 of Plaintiffs' Complaint.

*D.  Facts Pertinent to Plaintiffs Claims*

39.     Defendant is the servicer of Plaintiffs home mortgage, which is secured by property commonly known as 2 Aspen Lane Chesterton, Indiana 46304, located in Porter County.

**ANSWER:**

BANA admits it is the servicer of Plaintiffs' mortgage, which is secured by property commonly known as 2 Aspen Lane, Chesterton, Indiana 46304, located in Porter County.

40.     Plaintiffs loan is a non-GSE loan, falling within the Treasury's HAMP regulations and the Servicer Participation Agreement outlined above.[4]

---

[4] While HAMP participation is required for loans guaranteed by Fannie Mae or Freddie Mac ("GSE loans"), Fannie Mae and Freddie Mac have published their own guidelines for its securitized loans.  Non-GSE loans are governed by the Treasury's HAMP directives and the Servicer, Participation Agreement outlined supra, Part I(a)-(c).

**ANSWER:**

BANA admits Plaintiffs' loan is a non-GSE loan.   The remaining allegations of Paragraph 40 of Plaintiffs' Complaint constitute legal conclusions to which no response is required.

41.     Defendant, at all relevant times herein, was the servicer of the Plaintiffs mortgage under the Making Homes Affordable Act. Defendant has accepted billions of dollars from the government as part of the Emergency Economic Stabilization Act of 2008 and the American Recovery and Reinvestment Act of 2009 that was passed by Congress.  Defendant's acceptance of *"bail-out"* money bound it to the obligations and requirements of the HAMP program under the Making Homes Affordable Act discussed above.

**ANSWER:**

BANA denies the allegations of Paragraph 41 of Plaintiffs' Complaint.

42.     Plaintiff Mr. Kleyweg (*"Kleyweg"*), has enjoyed a career as a Professional in the Construction Industry for most of his life and with a great deal of success.  However, with the recession in the economy starting in 2008, the construction industry felt the impact more than most industries and by late 2011, Mr. Kleyweg realized future employment would be highly unlikely.

**ANSWER:**

BANA is without sufficient knowledge or information to admit or deny the allegations of Paragraph 42 of Plaintiffs' Complaint and, therefore, denies the same.

43.     On or about February 12, 2012 Mr. Kleyweg contacted Bank of America by phone to discuss the possible options for HAMP modification or refinance and spoke with Ms. Chris Scott who referred him to Stephen Bilos; who on February 3rd 2012 contacted Mr.

Kleyweg and discussed the HAMP loan application process and pulled his credit to begin the modification process.

**ANSWER:**

BANA denies the allegations of Paragraph 43 of Plaintiffs' Complaint as stated.

44.    On or about February 9th 2012 the Kleywegs received a letter in the mail from Bank of America, which included the *"Request for Modification"* forms, affidavits, and other miscellaneous forms to complete as part of the HAMP loan application process; for clarification Mr. Kleyweg called and spoke to Ann Baker from Bank of America to explain some of the requested documentation and was instructed to fax the documentation to Jennifer Rucci.

**ANSWER:**

BANA admits that it sent a HAMP solicitation letter to Plaintiffs on or about February 10, 2012.  BANA is without sufficient knowledge or information to admit or deny the allegations of Paragraph 44 of Plaintiffs' Complaint, and, therefore, denies them.

45.    On or about February 14th 2012, the Kleywegs faxed all of the forms and documentation to Jennifer Rucci and on February 17th 2012, received a letter from her, introducing herself and the possible programs available to the Kleywegs and on February 28th 2012, they received a letter from Bank of America acknowledging receipt of the their inquiry for home loan modification and that the Bank was in the process of obtaining the documents and information to address the Kleywegs questions.  The next day, the Kleywegs spoke with Jennifer Rucci and she requested them to resend the documents that were faxed on February 14th 2012, because she did not have them for some unknown reason.

**ANSWER:**

BANA admits it received some, but not all, of the requested forms and documentation from Plaintiffs' on or about February 17, 2012.  BANA admits that Jennifer Rucci sent a letter introducing herself and the possible programs BANA has to help homeowners who are having trouble making their monthly mortgage payments.  BANA is without sufficient knowledge or information to admit or deny the allegations of Paragraph 45 of Plaintiffs' Complaint, and, therefore, denies them.

46.     The Kleywegs made their last payment for the month of February 2012 and on or around March 19th 2012, spoke with Jennifer Rucci who informed them that their loan would be placed in a payment deferment program for six (6) months and would not have to make a mortgage payment during this time.  Ms. Rucci stated that all of the required loan documents and paperwork had been submitted to underwriting on March 15th 2012, that it would take about thirty (30) days to complete.  During this conversation they spoke about the different loan programs and compared the HAUP and HAMP program.  Mr. Kleyweg informed Ms. Rucci, that they only wanted the HAMP program not HAUP because HAUP would only postpone and further complicate their financial situation by adding a lump sum of interest to be paid at the end of six (6) months; Ms. Rucci informed the Kleywegs that they were in-fact applying for HAMP, not HAUP.

**ANSWER:**

BANA admits Plaintiffs' were approved for the MHAUP program.  BANA denies the remaining allegations of Paragraph 46 of Plaintiffs' Complaint.

47.     On or about April 26th 2012 the Kleywegs received a letter from the *"Home Loan Team"* at Bank of America indicating they were considering their loan for relief under terms of

the Department of Justice ("DOJ") and the State Attorney General's Global Settlement but no follow-up was ever provided.

      **ANSWER:**

      BANA is without sufficient knowledge or information to admit or deny the allegations of Paragraph 47 of Plaintiffs' Complaint, and, therefore, denies them.

      48.    On or about April 27th 2012, the Kleywegs received a notice by mail that they were a month behind on their mortgage payment, not acknowledging that they were in a deferment program.  In response, Mr. Kleyweg called and left messages for Ms. Rucci to call him back regarding the notice of past-due payment and on May 16th 2012, was finally able to reach Ms. Rucci and voice his concern about the letter stating he was in default She advised the Kleywegs not to worry and stated that she would attempt to have the letters suppressed but that the person at Bank of America she would need to consult regarding this problem was out of the office; she also stated that there was an issue between the Government and the Bank with the way they do reporting.

      **ANSWER:**

      BANA denies the allegations of Paragraph 48 of Plaintiffs' Complaint as stated.

      49.    On August 11th 2012 the Kleywegs received a letter from Jennifer Rucci at Bank of America, thanking them for their application to HAMP and requesting paystubs to support their application (paystubs they had already sent in) by August 16th 2012.  On receipt of the letter the Kleywegs called Ms. Rucci and she was unavailable so they spoke with Corey Carver regarding the HAMP process but was not provided with any substantive information about their loan.  The requested paystubs were faxed to Jennifer Rucci on August 16th 2012, again on August 21st 2012, and again on August 28th 2012, as Ms. Rucci reported they were not received.

After faxed again on August 28th 2012, the Kleywegs called in to speak with Ms. Rucci who was again unavailable and instead spoke with Jake Avech, in an attempt to verify that the documents were received but he stated that he could not find the documents.

**ANSWER:**

BANA denies the allegations of Paragraph 49 of Plaintiffs' Complaint as stated.

50.     On or about September 12th 2012, the Kleywegs called Jennifer Rucci and left a message asking for a status update on their modification. Ms. Rucci returned their call on September 14th 2012 and stated that the HAMP application would be sent out to them on October 1st 2012 in overnight mail delivery.  However, no package of documents arrived an on October 2, 2012 the Kleywegs called Ms. Rucci to inform her they had not received the package. Having received no return call from Ms. Rucci, the Kleywegs called again on October 5th 2012 but Ms. Rucci was unavailable and spoke with Grimelna Hughs who stated she could not assist the Kleywegs and scheduled a call to take place on Monday October 8th 2012 at 8am where they could speak with Ms. Rucci.  Not surprisingly, on October 8th 2012, the Kleywegs called Ms. Rucci and could not reach her so they left a message for her to call.

**ANSWER:**

BANA denies the allegations of Paragraph 50 of Plaintiffs' Complaint as stated.

51.     On October 9th 2012, the Kleywegs received a letter entitled *"Notice of Intent to Accelerate & Foreclose"* to which they were told by Ms. Rucci not to worry about the automated letters, nothing was going to happen.  The next day on October 10th 2012, the Kleywegs received a letter from Ms. Rucci thanking them for their interest in the HAMP program and requested more information (which they had already provided).  Two days later on October 12th 2012 the Kleywegs received a letter from bank of America claiming they had received their

request for loan modification and it was forwarded to a specialist in the appropriate department. On October 16th 2012 Ms. Rucci finally responded with a phone call but the Kleywegs were not home to take her call. It was during this month the Kleywegs were told they did not qualify for the HAUP program and would have to apply for the HAMP program even though they were told they had been applying to the HAMP program the entire time; as well, they were told by Bank of America Representatives that their six month deferral of mortgage payments would be extended another six months so they would not have to make their mortgage payments.

**ANSWER:**

BANA denies the allegations of Paragraph 51 of Plaintiffs' Complaint as stated.

52.    On October 17th 2012 the Kleywegs called Ms. Rucci but she was unavailable so they were transferred to her manager, Richard Schultz and left a message for him but because he wasn't available they were transferred to his manager, who was also unable to provide substantive answers regarding the status of their application.  On or about November 6th 2012, Ms. Rucci verified that their documentation was received that they sent in.  On or about November 26th 2012 the Kleywegs attempted to reach Ms. Rucci for a status update but she was unavailable and they Spoke with Trisha Scott who said she had no information regarding their loan and would call them back within 24 hours.  On November 27th 2012, Trisha Scott called the Kleywegs and advised them that the last remaining documents were scanned into their system for loan modification.  That same day Mr. Kleyweg left a message with Richard Shultz and his manager requesting a call back regarding his concerns but neither returned the Kleywegs call.

**ANSWER:**

BANA admits that Jennifer Rucci advised Plaintiffs' that their loan was still in review on November 6, 2012.  BANA admits that on November 26, 2012, Plaintiffs spoke with Trisha

Scott who advised that she would review Plaintiffs' file and return their call within twenty-four hours.  BANA admits that on November 27, 2012, Trisha Scott advised Plaintiffs that their loan was still in review.  BANA is without sufficient information or knowledge to admit or deny the remaining allegations of Paragraph 51 of Plaintiffs' Complaint, and therefore, denies them.

53.     On December 10th 2012 the Kleywegs called Ms. Rucci who was again unavailable but instead spoke with Pam Bills who informed them the notes on their file indicated on 12/04/12 someone from the forbearance division was assigned to their file.  On or about December 17th 2012, the Kleywegs received notice advising their account had been forwarded to a specialist in the appropriate department.  On or about December 31st 2012 the Kleywegs received a statement from Bank of America indicating that escrow for taxes and insurance had been added to the payment; however no notice was given and they were not behind on taxes or insurance.

**ANSWER:**

BANA is without sufficient information or knowledge to admit or deny the allegations of Paragraph 53 of Plaintiffs' Complaint, and therefore, denies them.

54.     On or about January 9th 2013, the Kleywegs (being tired of the runaround with Bank of America) contacted Rebecca Hunt at SISTAR Mortgage to inquire about a refinance through another institution, rather than a loan modification.  The mortgage company informed the Kleywegs that based on their qualifications they would be able to refinance and save $1,400 or more per month but upon pulling credit they found one derogatory credit report item that would keep them from being approved.  In November of 2012, Bank of America had reported them 120 days past due with every month prior to that reported as current or not reported at all. This information was not only inaccurate because they were in a deferment, but it is also in

violation of the Fair Credit Reporting Act.  Prior to this negative item, the Kleywegs had perfect credit with an impeccable rating and now a fraudulent report was ruining their credit and keeping them from being able to refinance their loan.  The Kleywegs promptly contacted Bank of America and informed them of the situation, asking them to correct their credit reporting; however they were told that nothing could be done and they should contact the credit reporting agencies instead (which would be a waste of time if the source is unwilling to change it).

     **ANSWER:**

     BANA denies the allegations of Paragraph 54 of Plaintiffs' Complaint.

     55.    Upon entering the Trial Payment Plan or TPP, the Kleywegs were only provided with the Payment amount and nothing more than ranges or potentials for the other loan terms.  They were told that they would not receive any final numbers until after the TPP was completed successfully.  Upon receiving the final documents, an amount in excess of $41,000 in accrued interest was refinanced into the loan.  During the modification period Kleywegs were advised numerous times that no fees, costs, or extra interest would be added into the new loan but the final modification documents clearly include additional fees and interest.

     **ANSWER:**

     BANA admits that Plaintiffs were approved for a Trial Period Plan in January 2013.  The first trial payment in the amount of $4,105.68 was due on February 1, 2013.  BANA is without sufficient information or knowledge to admit or deny the remaining allegations of Paragraph 55 of Plaintiffs' Complaint, and therefore, denies them.

     56.    In or around February the Kleywegs, by counsel, disputed the inaccurate information placed on their credit report by Bank of America with the three credit reporting

agencies.  They confirmed with the source (Bank of America) that all prior reporting was in-fact correct, and refused to remove the inaccurate information from the credit reports.

**ANSWER:**

BANA is without sufficient information or knowledge to admit or deny the allegations of Paragraph 56 of Plaintiffs' Complaint, and therefore, denies them.

57.    In or around April 2013, the Kleywegs, by counsel, sent correspondence to the Office of The CEO and President of Bank of America requesting intervention to remedy the problem that Bank of America had created for the Kleywegs, specifically to refund the accrued interest rolled into the loan, and most importantly to fix the inaccurate credit reporting.  Martin Buxton, Customer Advocate from the Office of the CEO & President, stood strongly to defend the actions of Bank of America and even stated that having credit damaged can be the result of refinancing and that Bank of Americas reporting on this account was accurate, even though the Kleywegs were in a Bank of America approved deferment.

**ANSWER:**

BANA is without sufficient information or knowledge to admit or deny the allegations of Paragraph 57 of Plaintiffs' Complaint, and therefore, denies them.

### FAIR CREDIT REPORTING ACT (FCRA) VIOLATIONS 1 - 6

#### COUNT 1— Reporting Information with Actual Knowledge of Errors

58.    The Plaintiff realleges and incorporates paragraphs 1— 57 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 57 of Plaintiffs' Complaint as if fully set out herein.

59.     That under 15 U.S.C.A. § 1681s-2(a)(1)(A) of the Fair Credit Reporting Act (*"FCRA"*), Defendants owed a duty to the Plaintiff to not furnish any information relating to consumer Plaintiffs to any consumer reporting agency if they knew or had reasonable cause to believe that the information is inaccurate; mainly that Defendants had had a duty to furnish complete and accurate information to the consumer reporting agencies.

**ANSWER:**

BANA denies the allegations of Paragraph 59 of Plaintiffs' Complaint.

60.     That the Defendants breached that duty when they knowingly and willingly reported/furnished information, to all three consumer reporting agencies that the Plaintiffs were over 120 days past due on their mortgage, when in-fact, the Plaintiffs were in a deferment program created by the Defendants where they were instructed not to make payments and would not be penalized for doing so.

**ANSWER:**

BANA denies the allegations of Paragraph 60 of Plaintiffs' Complaint.

61.     That the Defendants were the actual and proximate cause of the breach of duty.

**ANSWER:**

BANA denies the allegations of Paragraph 61 of Plaintiffs' Complaint.

62.     As a result of the Defendants actions, the Plaintiffs were unable to secure a refinance From a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00 added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

26

**ANSWER:**

BANA denies the allegations of Paragraph 62 of Plaintiffs' Complaint.

63.    That each incident of furnishing incorrect information to a credit agency constitutes a separate violation of the Fair Credit Reporting Act, section previously mentioned.

**ANSWER:**

BANA denies the allegations of Paragraph 63 of Plaintiffs' Complaint.

**COUNT 2 — Furnishing Inaccurate Information After Being Notified**

64.    The Plaintiff realleges and incorporates paragraphs 1— 63 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 63 of Plaintiffs' Complaint as if fully set out herein.

65.    That under 15 U.S.C.A. § 1681s-2(a)(1)(B) of the FCRA, the Defendants owed a duty to the Plaintiffs not to furnish consumer information about the Plaintiffs to a consumer reporting agency after they were notified by the Plaintiffs that the information currently being furnished was inaccurate.

**ANSWER:**

BANA denies the allegations of Paragraph 65 of Plaintiffs' Complaint.

66.    That the Defendants breached the duty they owed to the Plaintiffs when they continued to furnish inaccurate information to consumer reporting agencies after they were notified by the Plaintiffs that they information was inaccurate.

**ANSWER:**

BANA denies the allegations of Paragraph 66 of Plaintiffs' Complaint.

67.    That the Defendants were the actual and proximate cause of the breach of duty.

**ANSWER:**

BANA denies the allegations of Paragraph 67 of Plaintiffs' Complaint.

68.     As a result of the Defendants actions, the Plaintiffs were unable to secure a refinance From a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00 added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

**ANSWER:**

BANA denies the allegations of Paragraph 68 of Plaintiffs' Complaint.

69.     That each incident of furnishing incorrect information to a credit agency constitutes a separate violation of the Fair Credit Reporting Act, section previously mentioned.

**ANSWER:**

BANA denies the allegations of Paragraph 69 of Plaintiffs' Complaint.

**COUNT 3 — Failure to Update and Correct Information Furnished to Agencies**

70.     The Plaintiff realleges and incorporates paragraphs 1 — 69 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 69 of Plaintiffs' Complaint as if fully set out herein.

71.     That under 15 U.S.C.A. § 1681s-2(a)(2)(A)(B) of the FCRA, the Defendants owed a duty to the Plaintiffs that upon determining information furnished about a consumer is inaccurate or incomplete, to promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that

is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate.

**ANSWER:**

BANA denies the allegations of Paragraph 71 of Plaintiffs' Complaint.

72.    That the Defendants breached the duty they owed to the Plaintiffs when they failed to promptly notify the consumer reporting agencies of the inaccurate or incomplete information and failed provide the correct or additional information necessary to fix the inaccurate information on the Plaintiffs credit report.

**ANSWER:**

BANA denies the allegations of Paragraph 72 of Plaintiffs' Complaint.

73.    That the Defendants were the actual and proximate cause of the breach of duty.

**ANSWER:**

BANA denies the allegations of Paragraph 73 of Plaintiffs' Complaint.

74.    As a result of the Defendants actions, the Plaintiffs were unable to secure a refinance From a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00 added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

**ANSWER:**

BANA denies the allegations of Paragraph 74 of Plaintiffs' Complaint.

75.     That each incident of furnishing incorrect information to a credit agency constitutes a separate violation of the Fair Credit Reporting Act, section previously mentioned.

**ANSWER:**

BANA denies the allegations of Paragraph 75 of Plaintiffs' Complaint.

**COUNT 4 — Failure to Provide Notice of Dispute to Credit Reporting Agencies**

76.     The Plaintiff realleges and incorporates paragraphs 1— 75 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 75 of Plaintiffs' Complaint as if fully set out herein.

77.     That under 15 U.S.C.A. § 1681s-2(a)(3) of the FCRA, the Defendant owed a duty to the Plaintiff, that if the completeness or accuracy of any information furnished by Defendant to any consumer reporting agency is disputed to the Defendant by Plaintiff, the Defendant may not furnish the information to any consumer reporting agency without notice that such information is disputed by the Plaintiff.

**ANSWER:**

BANA denies the allegations of Paragraph 77 of Plaintiffs' Complaint.

78.     That the Defendants breached the duty they owed to the Plaintiffs after the Plaintiffs disputed their mortgage payment history to the Defendants, and the Defendants failed to notify the consumer reporting agencies that the information was being disputed, and kept reporting the inaccurate information.

**ANSWER:**

BANA denies the allegations of Paragraph 78 of Plaintiffs' Complaint.

79.     That the Defendants were the actual and proximate cause of the breach of duty.

**ANSWER:**

BANA denies the allegations of Paragraph 79 of Plaintiffs' Complaint.

80.    As a result of the Defendants actions, the Plaintiffs were unable to secure a refinance From a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00 added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

**ANSWER:**

BANA denies the allegations of Paragraph 80 of Plaintiffs' Complaint.

81.    That each incident of furnishing incorrect information to a credit agency constitutes a separate violation of the Fair Credit Reporting Act, section previously mentioned.

**ANSWER:**

BANA denies the allegations of Paragraph 81 of Plaintiffs' Complaint.

**COUNT 5 — Failure to Properly Investigate & Review All Relevant Information**

82.    The Plaintiff realleges and incorporates paragraphs 1— 81 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 81 of Plaintiffs' Complaint as if fully set out herein.

83.    That under 15 U.S.C.A. § 1681s-2(a)(8)(E) of the FCRA, the Defendant owed a duty to the Plaintiff, to properly investigate and review all relevant information contained or referenced in a dispute from a consumer.

**ANSWER:**

BANA denies the allegations of Paragraph 83 of Plaintiffs' Complaint.

84.     That the Defendants breached the duty they owed to the Plaintiffs after the Plaintiffs disputed their mortgage payment history to the Defendants and the Defendants either intentionally or negligently failed to properly conduct an investigation of the Plaintiffs dispute and consider all relevant information supplied by the Plaintiffs; had they done so, the Defendants would have discovered the false information being furnished to the credit reporting agencies, specifically that the Defendants were reporting the Plaintiffs over 120 days past due on their mortgage when they were not past due at all.

**ANSWER:**

BANA denies the allegations of Paragraph 84 of Plaintiffs' Complaint.

85.     That the Defendants were the actual and proximate cause of the breach of duty.

**ANSWER:**

BANA denies the allegations of Paragraph 85 of Plaintiffs' Complaint.

86.     As a result of the Defendants actions, the Plaintiffs were unable to secure a refinance From a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00 added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

**ANSWER:**

BANA denies the allegations of Paragraph 86 of Plaintiffs' Complaint.

87.    That each incident of furnishing incorrect information to a credit agency constitutes a separate violation of the Fair Credit Reporting Act, section previously mentioned.

**ANSWER:**

BANA denies the allegations of Paragraph 87 of Plaintiffs' Complaint.

**COUNT 6 — Failure to Review All Relevant Data from a Consumer Reporting Agency**

88.    The Plaintiff realleges and incorporates paragraphs 1— 87 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 87 of Plaintiffs' Complaint as if fully set out herein.

89.    That under 15 U.S.C.A. § 1681s-2(b)(A)-(E) of the FCRA, the Defendant owed a duty to the Plaintiff, to properly investigate and review all relevant information contained or referenced in a dispute supplied to the Defendant from a consumer reporting agency.

**ANSWER:**

BANA denies the allegations of Paragraph 89 of Plaintiffs' Complaint.

90.    That the Defendants breached the duty they owed to the Plaintiffs after Plaintiffs submitted a dispute regarding the payment history of their Bank of America Account to a consumer reporting agency; when said agency submitted a dispute to the Defendants, the Defendants intentionally or negligently failed to conduct a proper investigation into the dispute and intentionally or negligently failed to review all relevant information provided by the consumer reporting agency.

**ANSWER:**

BANA denies the allegations of Paragraph 90 of Plaintiffs' Complaint.

91.    That the Defendants were the actual and proximate cause of the breach of duty.

**ANSWER:**

BANA denies the allegations of Paragraph 91 of Plaintiffs' Complaint.

92.    As a result of the Defendants actions, the Plaintiffs were unable to secure a refinance From a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00 added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

**ANSWER:**

BANA denies the allegations of Paragraph 92 of Plaintiffs' Complaint.

93.    That each incident of breaching this duty to each consumer reporting agency constitutes a separate violation under the aforementioned section of the FCRA.

**ANSWER:**

BANA denies the allegations of Paragraph 93 of Plaintiffs' Complaint.

<strong>COUNT 7 — NEGLIGENT MORTGAGE SERVICING</strong>

94.    The Plaintiff realleges and incorporates paragraphs 1— 93 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 93 of Plaintiffs' Complaint as if fully set out herein.

95.    That the Defendants owed Plaintiff a duty to service their mortgage loan in a responsible and reasonable manner or reasonable duty of care that would be expected of a lender in like situation.

**ANSWER:**

BANA denies the allegations of Paragraph 95 of Plaintiffs' Complaint.

96.     That Defendants violated its duty of care to Plaintiffs when it repeatedly violated the FCRA, lied to Plaintiffs with regard to applying for HAUP rather than HAMP, failed to return calls in a reasonable time, made appointments with Plaintiffs they did not keep, lost sensitive documents from the Plaintiffs, and took an entire year just to place the Plaintiffs in a HAMP refinance; these being all actions that would not have been committed by a lender using reasonable care in like circumstances

**ANSWER:**

BANA denies the allegations of Paragraph 96 of Plaintiffs' Complaint.

97.     As a result of the Defendants actions, the Plaintiffs were unable to secure a refinance From a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00 added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

**ANSWER:**

BANA denies the allegations of Paragraph 97 of Plaintiffs' Complaint.

**COUNT 8 — NEGLIGENT TRAINING & SUPERVISION**

98.     The Plaintiff realleges and incorporates paragraphs 1— 93 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 97 of Plaintiffs' Complaint as if fully set out herein.

99.    The Defendants owed Plaintiffs a duty of reasonable care in training and supervising its employees to service consumer loans and process refinances including HAMP refinances.

**ANSWER:**

BANA denies the allegations of Paragraph 99 of Plaintiffs' Complaint.

100.    That Defendants violated its duty to the Plaintiffs by negligently failing to use reasonable care in adequately training and supervising its employees which resulted; Defendant's employees routinely informed the Plaintiffs that additional fees and interest would not be rolled into their HAMP refinance, but they were; during the refinance HAMP refinance process Defendant's employees advised Plaintiffs they were initially applying for HAMP but were actually applying for HAUP; during the refinance, Defendant's employees wrongfully furnished incorrect information regarding the Plaintiffs' payment history on their mortgage; during the refinance process Defendant's employees regularly lost confidential income and loan documents sent in by the Plaintiffs'; Defendant's employees regularly made appointments for phone calls with the Plaintiffs but would fail to keep these appointments or notify the Plaintiffs that the appointment would not take place; and these actions provide a clear showing of Defendant's failure to use reasonable care in adequately training and supervise its employees.

**ANSWER:**

BANA denies the allegations of Paragraph 100 of Plaintiffs' Complaint.

101.    As a result of the Defendants actions, the Plaintiffs were unable to secure a refinance From a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00

added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

**ANSWER:**

BANA denies the allegations of Paragraph 101 of Plaintiffs' Complaint.

**COUNT 9 — BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING**

102.    The Plaintiff realleges and incorporates paragraphs 1 — 101 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 101 of Plaintiffs' Complaint as if fully set out herein.

103.    Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

**ANSWER:**

BANA denies the allegations of Paragraph 103 of Plaintiffs' Complaint.

104.    The purpose of the covenant of good faith and fair dealing is to guarantee that the parties remain committed to the intended and agreed-upon expectations of the parties in their performance.

**ANSWER:**

The allegations of Paragraph 104 of the Plaintiffs' Complaint constitute a legal conclusion to which no response is required.

105.    Defendant routinely and regularly breached this duty by:

a.    failing to perform loan servicing functions consistent with its responsibilities to Plaintiff;

b.    failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

c.      routinely demanding information already in its files;

d.      making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP;

e.      Violating FCRA; and

f.      misrepresenting to the Plaintiff that they were applying to HAMP when the servicer was actually applying HAUP.

**ANSWER:**

BANA denies the allegations of Paragraph 105 of Plaintiffs' Complaint including Sub-Paragraphs a. – f.

106.    On information and belief, Defendant engaged in the conduct in a deliberate attempt to discourage borrowers from successfully refinancing through HAMP or they intentionally increased the amount of time to refinance Plaintiffs, while keeping them in a Forbearance program, to increase deferred interest to roll into the new loan, thereby increasing the total amount of the new loan (making money for the Defendants).

**ANSWER:**

BANA denies the allegations of Paragraph 106 of Plaintiffs' Complaint.

107.    As a result of these failures to act in good faith and the absence of fair dealing Defendant caused Plaintiff harm, the Plaintiffs were unable to secure a refinance from a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00 added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

**ANSWER:**

BANA denies the allegations of Paragraph 107 of Plaintiffs' Complaint.

**COUNT 10 — Fraud; Fraudulent Misrepresentation Or Concealment**

108.    The Plaintiff realleges and incorporates paragraphs 1 — 107 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 107 of Plaintiffs' Complaint as if fully set out herein.

109.    The Defendants owed a duty to Plaintiffs to fully and truthfully disclose all terms and material facts of the agreement and process for HAMP refinance.

**ANSWER:**

BANA denies the allegations of Paragraph 109 of Plaintiffs' Complaint.

110.    That the Defendants breached this duty to Plaintiffs when they informed Plaintiffs that they were applying for HAMP but Defendants had actually submitted an application for HAUP; when representatives for the Defendants informed the Plaintiffs that no interest, fees, or penalties would be rolled into the loan but they were in-fact rolled into the loan.  Had these material facts been disclosed to Plaintiffs, they would not have engaged in refinance with the Defendants.

**ANSWER:**

BANA denies the allegations of Paragraph 110 of Plaintiffs' Complaint.

111.    As a result of the Defendants actions, the Plaintiffs were unable to secure a refinance From a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00 added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

**ANSWER:**

BANA denies the allegations of Paragraph 111 of Plaintiffs' Complaint.

### INDIANA CONSUMER PROTECTION VIOLATIONS

### COUNT 9 — Home Loan Practices Violation

112.    The Plaintiff realleges and incorporates paragraphs 1 — 111 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 111 of Plaintiffs' Complaint as if fully set out herein.

113.    That the Defendants violated Indiana Code. 24-9-2-7 by committing a deceptive act when Defendants knowingly made material misrepresentations to Plaintiffs concerning their refinance of their home loan.

**ANSWER:**

BANA denies the allegations of Paragraph 113 of Plaintiffs' Complaint.

114.    As a result of the Defendants actions, the Plaintiffs were unable to secure a refinance From a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00 added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

**ANSWER:**

BANA denies the allegations of Paragraph 114 of Plaintiffs' Complaint.

### COUNT 10 — Uniform Consumer Credit Code

115.    The Plaintiff realleges and incorporates paragraphs 1 — 114 above as if fully set out herein.

**ANSWER:**

BANA reasserts its Answers in response to Paragraphs 1 – 114 of Plaintiffs' Complaint as if fully set out herein.

116.    That Defendants violated Indiana Code. 24-4.5-1-102(7) by violating the Fair Credit Reporting Act; such violation of state or federal consumer protection laws constitutes a violation under this code.

**ANSWER:**

BANA denies the allegations of Paragraph 116 of Plaintiffs' Complaint.

117.    As a result of the Defendants actions, the Plaintiffs were unable to secure a refinance From a different lender at a lower interest rate, they suffered damage to their creditworthiness and reputation; the Plaintiffs suffered extreme financial damages from this loss, including but not limited to the accrued interest rolled into the new loan more than $40,000.00 added on by the Defendants, future interest to be paid over the lifetime of the new loan, and extreme emotional distress.

**ANSWER:**

BANA denies the allegations of Paragraph 117 of Plaintiffs' Complaint.

118.    Indiana Code allows the judge or jury to award treble damages for violations of the Indiana Consumer Protection Act.

WHEREFORE, BANA prays that Plaintiffs take nothing by way of their Complaint, for costs of this matter, and for all just and proper relief.

## AFFIRMATIVE DEFENSES

BANA, by counsel, asserts the following additional defenses:

1.      Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

2.      Some or all of Plaintiffs' claims are barred by the statute of limitations.

3.      Plaintiffs' claims are, in whole or in part, preempted by applicable law.

4.      Plaintiffs' claims are barred by the terms and conditions of the contracts that are the subject of this lawsuit.

5.      Plaintiffs' damages, if any, are the result of acts or omissions of persons or entities other than BANA, including but not limited to nonparties yet to be identified, and are in no way attributable to any wrongdoing on the part of BANA.

6.      Plaintiffs' damages, if any, are the result of acts or omissions committed by Plaintiffs, and are in no way attributable to any wrongdoing on the part of BANA.

7.      Plaintiffs failed to mitigate their damages.

8.      Plaintiffs' damages, if any, are barred or reduced in accordance with the doctrines of estoppel, waiver, release, settlement, accord and satisfaction, acquiescence, mistake, consent, offset, preemption, and laches.

9.      Some or all of the damages claimed in Plaintiffs' Complaint are not recoverable under applicable law.

10.      Plaintiffs are not entitled to the recovery of punitive damages as a matter of law.

11.      Any claims for exemplary or punitive damages asserted by Plaintiffs violates BANA's rights under the Due Process and Excessive Fines clauses of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under the First Amendment of the United States Constitution.

12.     Plaintiffs' Complaint fails to state a claim for which attorneys' fees may be awarded.

WHEREFORE, BANA, by counsel, asks that Plaintiffs takes nothing by way of their Complaint, for costs of this matter, and for all just and proper relief.

FROST BROWN TODD LLC


By:  */s/ Jacob V. Bradley*
       Jacob V. Bradley, #27750-49
       Alexander P. Will, #23474-49

       Attorneys for Bank of America, N.A.

**CERTIFICATE OF SERVICE**

I hereby certify that on 28th ay of May, 2014, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


Blake N. Dahl
FRED W. GRADY & ASSOCIATES, P.C.
Blake@LawFirmIndiana.com

                                        */s/ Jacob V. Bradley*
                                        Jacob V. Bradley


FROST BROWN TODD LLC
201 N. Illinois St., Suite 1900
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
jbradley@fbtlaw.com
awill@fbtlaw.com


INDLibrary2 BT07586.0616308   1302995v1